# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JAMES LESTER WILLIAMS, JR.,

     Plaintiff,

v.                                   Case No. 8:20-cv-2842-WFJ-SPF

POLK COUNTY BOARD OF COUNTY
COMMISSIONERS,

     Defendant.

_____/

## <u>ORDER GRANTING SUMMARY JUDGMENT</u>

Before the Court is Defendant's motion for summary judgment and all the affidavits, depositions, and exhibits attached, together with a supplement (Dkts. 24, 42), the responses (Dkts. 25, 39), and the replies (Dkts. 26, 42).[1]  After careful consideration of the submissions of the parties, the applicable law, and the entire file, the Court concludes that the motion should be granted.  Summary judgment is due to be entered for Defendant.

## BACKGROUND

Plaintiff James Lester Williams, Jr. brings this action against his former employer, the Polk County Board of County Commissioners ("the BOCC"), for

---

[1] The Court permitted each side to supplement their respective submissions after granting in part a motion to compel discovery.  Dkt. 34.

race-based discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, age

discrimination under the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621, and retaliation under Title VII.  Dkts. 15 & 18.  Mr. Williams is

African American and was 40 years old when he was hired in October 2016.  Dkt.

24-2 at 4.  Mr. Williams was terminated for cause in December 2019.

## FACTUAL RECORD

On October 21, 2016, the BOCC hired Mr. Williams as a Veteran Services

Officer.  On May 20, 2019, he was promoted to Veteran Services Supervisor.

Marcia Andresen, the Director of Health and Human Services Division for the

County, sat on the race- and gender-diverse panel and served as the ultimate

decision maker for the position of Veteran Services Supervisor.  Dkt. 24-3 ¶¶ 2, 5–

6.  She promoted Mr. Williams over Joseph Lesniewicz, a fellow Veteran Services

Officer who was about ten years younger and white/Caucasian.  *Id*. ¶ 7.  Mr.

Williams was determined to be the most qualified.  *Id*. ¶¶ 8–9.

Mr. Williams' new position entailed supervising several Veteran Services

Officers, including Mr. Lesniewicz, Timothy Kirkhart (white/Caucasian), and

Harry Clark (black/African American).  *Id.* ¶ 24; Dk. 15 ¶¶ 25, 31, 41. Plaintiff's

direct supervisor was Ms. Andresen (Caucasian).  Dkt. 24-3 ¶ 3; Dkt. 15 ¶ 19.  The

Veteran Services Officers meet with veterans about their benefits issues by

appointment in their offices.  *See* Dkt. 24-21 at 13–41.  They provide advice and

must fill out the appropriate paperwork regarding the veterans' claims. *Id.* The officers attend training sessions, which they are required to prepare and present, in the office. *Id.* They are also required to engage in outreach in the communities. *Id.*

*Events Leading Up to Termination*

Shortly after the promotion, Ms. Andresen began receiving complaints about Plaintiff's supervisory style from Mr. Lesniewicz, Mr. Kirkhart, and Mr. Clark. Dkt. 24-3 ¶ 16. He was described as authoritarian, demeaning, and disrespectful. *Id.* None of the complaints were related to his race or age. *Id.* ¶ 17. Ms. Andresen met with Mr. Williams weekly or biweekly and urged him to work on team building. *Id.* ¶ 18; Dkt. 24-21 at 6.

Ms. Andresen gave Mr. Williams a written evaluation three months into his new position. Dkt. 24-3 ¶ 21 & at 12. Mr. Williams was commended in the areas of community outreach, hiring new staff, and working on a strategic planning initiative. *Id.* at 12. With respect to his own team, he was encouraged to stave off his supervisees' burnout by helping them balance in-office client visits, paperwork, and phone calls with outreach. *Id.*

Complaints from his subordinates continued. *Id.* ¶ 22. They were expressing their desires to quit under the supervision of Mr. Williams. *Id.* ¶ 22. At the five-month mark, Ms. Andresen sent a follow-up memorandum dated October

16, 2019.  *Id.* ¶ 32 & at 13.  In the memorandum, she directly stated that his team is "disgruntled and actively looking for other jobs."  *Id.* at 13.  She wrote: 'this is a reflection of your leadership style."  *Id*.  The memorandum is quite pointed about Mr. Williams' shortcomings as a supervisor.  It cautions: "You are currently on 6-month probation in your position and if improvement is not clear by the end of this period, I will have to consider further action."  *Id*.

Complaints nevertheless continued.  *Id.* ¶ 25.  On November 7, 2019, Ms. Andresen issued another memorandum.  *Id.* ¶ 27 & at 14–15.  She again stressed that, with respect to Plaintiff's team, his leadership skills fell short, so much so that his probationary period was extended by one month to December 11, 2019.  *Id.* at 15.  She cautioned that '[i]f immediate changes in all of the expected areas are not demonstrated, further action up to and including termination will be considered."  *Id*.

<u>*Termination*</u>

On December 11, 2019, Ms. Andresen issued an Employee Action Form ("EAF") that terminated Mr. Williams effective December 13, 2019.  *Id.* at 16−17; Dkt. 24-10 ¶ 5.  A few weeks prior to his termination, on November 21, 2019, Plaintiff met with the Employee Relations Manager of the Polk County Equity and Human Resources Division, Alejandro Velazquez.  Dkt. 24-3 ¶ 31; Dkt. 24-10 ¶¶

4

2, 4 & at 4–5.[2]  On December 19, 2019, Mr. Velazquez wrote to Plaintiff that he would be permitted a pre-disciplinary conference pursuant to the Polk County Employee Handbook.  Dkt. 24-3 ¶ 31; Dkt. 24-10 at 4.

On January 7, 2020, Plaintiff attended the pre-disciplinary conference held with Ms. Andresen, the person required by the handbook to conduct the meeting in her position as the Division Director.  Dkt. 24-3 ¶¶ 31–33; Dkt. 24-10 at 5.  Ms. Andresen issued a written decision on January 9, 2020, upholding the termination.  Dkt. 24-3 ¶ 34 & at 17.  She wrote that Mr. Williams took no responsibility for the complaints of his subordinates but blamed their unhappiness on "a change in culture and the need to make decisions that were unpopular."  *Id.* The "change in culture" refers to Mr. Williams' desire to reprimand his subordinates for tardiness rather than adhering to Ms. Andresen's advice that he should permit a more flexible schedule to accommodate their heavy caseloads.  *See generally* Dkt. 24-21.  According to Ms. Andresen, Mr. Williams did not follow Ms. Andresen's directives to alleviate the morale problem.  Dkt. 24-3 ¶ 34.

*The Appeal*

Plaintiff appealed this decision to the appeals council.  *Id.* ¶ 36.  On March 6, 2020, a hearing was held before the four-member appeals council.  Dkt. 24-21.

---

[2] Mr. Velazquez reports directly to the Equity and Human Resources Director, Kandis Baker-Buford.  Dkt. 24-10 ¶ 3.

The appeals council included: Michelle Thurner (white), a Probation Director (Dkt. 24-7); John Tillett (white/Caucasian), an Environmental Technician (Dkt. 24-9); David Dix (white), a Maintenance and Construction Foreman (Dkt. 24-8); and Mike Brown from County Probation (Dkt. 24-21 at 1).  The hearing was conducted by Mr. Richard Bradford (black/African American), the Equal Employment Administrator.  *Id.*; Dkt. 24-3 at 17; Dkt. 24-6 ¶¶ 2–3.

The scope of the appeal hearing was limited to the events leading up to the EAF issued on December 11, 2019.  Dkt. 24-21 at 6.  Ms. Andresen appeared at the hearing as an advocate in favor of termination.  *Id.* at 1; Dkt. 24-3 ¶ 37.  Mr. Williams presented his case first.  Dkt. 24-21 at 2–13.  In his opening, Mr. Williams stated the reasons he believed he was not terminated for cause:

> I was not terminated for cause, not terminated for poor interaction, not terminated for poor development, nor quality, and nor quantity of work . . . . Once promoted to supervisor, there were other requirements of me, and advocating BOCC policies was one of them. Unfortunately for me, my team saw my advocacy for BOCC policies as a problem because it was something that was not advocated before. My team teamed up against me and ultimately got rid of me because I supported BOCC policies. I was terminated because I did my job and the employees didn't like it. Why my director [Ms. Andresen] sanctioned my advocacy of BOCC policies is unknown to me. The evidence will show today that I simply was an advocate of BOCC policies and I was an outstanding supervisor for Veteran Services.

*Id*. at 2.  Ms. Andresen countered that Mr. Williams' problems stemmed from his inability to transition from a Veteran Services Officer to a supervisor.  *Id*. at 6.  Ms. Andresen made it clear that when Plaintiff was first hired the team was in

good shape, but by his three-month evaluation—even though he scored satisfactory—he was advised to "provide team building to assist with team burnout." *Id*. at 7. Two months later she informed Mr. Williams in writing that "his team was disgruntled and his approach was authoritative and demeaning." *Id*. At this time, "he had alienated his team and morale was at an all-time low." *Id*.

Plaintiff called as a witness Cedric H. Cox, Sr., another County employee who sometimes attended outreach events with Plaintiff. *Id*. at 8–9. Mr. Cox testified that Clark came to talk to him about Lesniewicz and Kirkhart. According to Cox, Clark said Lesniewicz and Kirkhart "manipulated me [Clark] into going to [Ms. Andresen] to go against [Plaintiff]." *Id*. at 9. Mr. Cox admitted on cross that he had never witnessed Mr. Williams' interactions with his supervisees. *Id*.

At the hearing, Plaintiff testified next. *Id*. at 9–12. He stated that he always followed and enforced BOCC policies and denied that his leadership style was "my way or the highway." *Id*. at 11. He acknowledged that he brought a culture change to his work group:

> Were people upset about me enforcing BOCC policies that they were not accustomed to? Sure. Was there a culture change? Sure. Was it the right thing to do? Yes. That's what I got paid for.

*Id*.

Mr. Williams testified that he had emailed Mr. Velazquez to complain about Ms. Andresen not allowing him to write up any employee for violating BOCC

policies, particularly those policies relating to comp time and coming to work on time. *Id*. at 12.  When questioned by the appeals council, Plaintiff could not produce any such email sent to Mr. Velazquez and could not show that he complained to Mr. Velazquez about his issues with Ms. Andresen, as opposed to his issues with his subordinates failing to follow BOCC policies. *Id*. at 12.  The appeals council questioned him about how the work group functioned before he was made supervisor, and he responded that "it was supposed to always be whatever the BOCC handbook had, but it was . . . pretty much run however the supervisor—because he's in charge of who's coming and going." *Id*. at 13.  He stated that not having to go through the supervisor before leaving started when he took over the position. *Id*.

Three supervisees—Lesniewicz, Clark, and Kirkhart—testified for management. *Id*. at 13–41.  Mr. Lesniewicz testified that the team's morale declined when Plaintiff took over. *Id*. at 16.  As examples, Lesniewicz pointed to: the new requirements that they had to present their Tuesday morning training sessions by PowerPoint when some were not savvy with the technology; that Plaintiff stopped attending the Tuesday lunch with the team; and that Plaintiff told them they were not permitted to go to Ms. Andresen without first coming to him. *Id*. at 15–16.  Mr. Lesniewicz described the change as moving from Mr. Williams treating them as peers and enjoying the Tuesday sessions to Plaintiff "constant[ly]

8

talking down to us and treating us like children, micromanagement, it was just God-awful." *Id*. at 16–17.

Mr. Lesniewicz said that he felt retaliated against by Plaintiff. *Id*. at 17. He described the instance of engaging with Plaintiff in a heated discussion after a meeting. *Id*. He stated that immediately after the incident, Plaintiff followed him to his office and continued to argue. *Id*. Plaintiff then revoked Mr. Lesniewicz's preapproved leave for that afternoon. *Id*. Plaintiff, when cross examining Lesniewicz, stated that he did not recall approving Lesniewicz's leave that day. *Id*. at 22.

Ms. Andresen questioned Mr. Lesniewicz about Mr. Clark—specifically about a claim that was made that Mr. Lesniewicz and Mr. Kirkhart convinced Clark to talk to Ms. Andresen "about made-up issues because [Lesniewicz] wanted to be supervisor." *Id*. at 17. Lesniewicz responded: "It wasn't anybody running to anyone and talking. It was [Plaintiff] having his own conflicts with [Clark] and throwing him out of the office and screaming, 'Get out.'" *Id*.

Plaintiff cross examined Mr. Lesniewicz. *Id*. at 18–23. Lesniewicz testified that Plaintiff's prohibition of going to Ms. Andresen "created the fight between [Plaintiff] and [Clark], especially when [Clark] said to [Plaintiff], 'What happens if somebody has a problem with you? Now they're going to feel that they can't talk to somebody because they have to go to you first and you're the source of the

9

problem.'"  *Id*. at 20.  With respect to team building, Lesniewicz stated that

Plaintiff always turned a proposed outing into a work-related function involving

veterans despite officers' concerns that such activities were not feasible.  *Id*.  He

reiterated on cross that the new requirement of preparing PowerPoints for training

only served to further burden them with more tasks, given their already full

schedule meeting with veterans.  *Id*. at 21.

A member of the appeals council then asked Mr. Lesniewicz if the prior

supervisor went to lunch with them.  *Id*. at 23.  He responded, "Yes. . . . [the

former supervisor] would even cook us breakfast."  *Id*.  According to Lesniewicz,

the former supervisor did not pay for lunch unless it was an employee's first day,

and the supervisor was not expected to pay for everyone's lunch.  *Id*. at 23–24.

Mr. Williams had stated earlier in the hearing that he would not ask his supervisees

to lunch unless he could pay for them—"I can't []force people to go to lunch as a

team and not pay for their meal."  *Id*. at 10.

Tim Kirkhart, who was about fifteen years older than Plaintiff, next took the

stand.  Mr. Kirkhart's testimony focused on a particular incident when he was late

to work one day.  *Id*. at 24–25.  He stated that Plaintiff embarrassed him by

greeting him in front of several veterans with "you're just getting here? It's –

you're an hour late."  *Id*. at 24.  He explained that his first appointment was

typically at 9:15 a.m.  *Id*.  But from that time forward, Plaintiff punished him by

requiring him to start meeting with veterans at 8:15 a.m., even though he already stayed well past 5:00 p.m. the prior evening and needed the hour before his first appointment to catch up on necessary paperwork. *Id*. at 24–25. According to Kirkhart, Plaintiff then started asking everyone to text him personally if they would be late, although the standard operating procedure in place was to call the receptionist, Carol. *Id*. at 25, 30. Kirkhart also gave other examples of how Plaintiff disrespected or belittled him and noted that Plaintiff would make angry comments to the officers. *Id*. at 25–26.

On cross, Mr. Williams focused on Kirkhart's tardiness, weaving into his questions that he felt disrespected as the supervisor. *Id*. at 26–28. Kirkhart denied that he was habitually late but acknowledged that he had been required to attend time management classes by a prior supervisor. *Id*. at 27–28. Plaintiff pushed until, finally, Kirkhart reminded him that before he became supervisor, his fellow co-workers called Plaintiff "Mr. 4:59" because he always left early. *Id*. at 28–29. A lighter exchange followed, and Mr. Kirkhart gave his assessment of what changed at work after Mr. Williams became supervisor:

> As a boss, you've got pressures . . . but just the way you [Mr. Williams] carried yourself . . . you were completely different. . . .[Y]ou wanted to change everything, so that led to morale problems. . . . It was not pleasant to come to work. . . . I think in your heart you wanted to make it better, but I do think you were spiteful.

*Id*. at 29.

11

Next, Harry Clark took the stand. *Id*. at 30. He testified about several occasions where Mr. Williams had treated him with disrespect or failed to listen to what he had to say. *Id*. at 30–32. Mr. Clark was offended that Mr. Williams would send him to briefings only in Lakeland, Florida, because Mr. Williams believed he and another African American "would better fit in" in a "low-income area." *Id*. at 31. Clark felt he was being stereotyped as an African American and told Williams that "we shouldn't be basing it off of who fits in where because of our race." *Id*. When Clark wanted to talk to others above Williams about the issue, Williams told him, "Don't go to [Ms. Andresen] unless you come through me first." *Id*. The two of them then argued about "chain of command"—which Williams interpreted to mean always go to your immediate supervisor first—versus an "open door policy"—which Clark interpreted to mean an employee could choose to speak with someone above an immediate supervisor, such as Ms. Andresen. *Id*. To avoid being "shut down" by Williams, Clark tried to orchestrate a meeting with both Williams and Ms. Anderson to no avail. *Id*.

Ms. Andresen specifically asked Clark if he was "coerced into coming to talk to [her] by [Kirkhart and Lesniewicz] because [Lesniewicz] felt like if [Williams] was no longer the supervisor he had an opportunity to apply [for the supervisor position]." *Id*. He responded unequivocally: "No. . . . Nobody told me

to go to [Ms. Andresen]. Nobody told me, 'Hey, this will be a good idea so we can get rid of [Plaintiff].'" *Id*. at 32.

Clark also described the team meetings as "toxic" with everyone "on edge." *Id*. He testified there was no real "onboarding," stating that the standards of the office, such as proper dress code, were not conveyed to a new employee and no scheduled "one on one" supervision meetings occurred. *Id*. at 31–32. He described the atmosphere of the office as "tense" and like "walking on eggshells" with no "comradery, laughing, joking, or anything like that." *Id*. at 33.

On cross, it was evident that a lot of friction existed between Plaintiff and Mr. Clark. *Id*. at 34–38. Clark reiterated that Plaintiff assigned him and another African American to Lakeland based on their race. He stated:

> [T]the two people you [Mr. Williams] say were going to Lakeland in the low poverty areas were Julie Anne and myself, and we're both African American. Julie Anne even expressed she's from Jamaica. She's never lived in the projects. Why were we the only two that had to go to Lakeland in the projects? Because we're Black. You were sending Joe Lesniewicz back to the same area that you and [he] did a briefing, but because he's more of a cowboy, he more fits in because it's a white race area. That's where Joe was going. Ray [a Hispanic Veterans Services Officer] was going to the Hispanic areas.

*Id*. at 36. Clark also took issue with Plaintiff's failure to recognize Clark's ability to understand Spanish. *Id.* Clark noted that even though Plaintiff assumed Clark could not understand Spanish because he is black Clark can do so because his wife and three children are Dominican. *Id.* He stated he felt belittled and

uncomfortable at a meeting because Plaintiff claimed Clark was better suited for a poverty area. *Id*. Clark also claimed Plaintiff retaliated against him by giving him eight clients a day (all had previously belonged to Plaintiff) when other people had three, four, or five. *Id*. at 37.

With respect to Cedric Cox, Clark stated that Cox encouraged him to talk to Plaintiff about the discord between Clark and Lesniewicz. *Id*. at 38–39. Clark denied Cox's testimony that Clark was told by his two co-workers to try to get Plaintiff fired as supervisor by complaining about him to Ms. Andresen. *Id*. at 38–39, 41.

In Mr. Williams' closing argument, he accused Clark of being untruthful about what he and Cox discussed, asserting that it was truly about Lesniewicz and Kirkhart coercing Clark to get Plaintiff fired. *Id*. at 43–44. Plaintiff argued that the three co-workers did not want to be accountable for their coming and going and did not want to work hard. *Id*. at 42. Plaintiff stated he would still enforce the BOCC rules strictly today. *Id*. at 44.

In closing, Ms. Andresen argued that there had always been structure and guidance in the past regarding hours worked. *Id*. Ms. Andresen took issue with Mr. Williams' contention that his supervisees came and went as they pleased. *Id*. She attributed his supervisees' discontentment with Plaintiff's lack of leadership. *Id*. In her words:

> We've never had a team where the morale has been this low as when
> Mr. Williams was supervisor. His staff were so unhappy with him and
> his treatment of them that they were all on the brink of resigning, and I
> think a couple of them even mentioned that today.

*Id.* Nowhere in the transcript of the appeal hearing did Plaintiff argue that he was fired based on age or race, nor does the record contain a written internal complaint of discrimination or retaliation. *See* Dkt. 24-21; Dkt. 24 at 2.

*Termination Affirmed—other considerations*

After the hearing, the appeals council recommended to the County Manager, William Beasley, that Plaintiff's termination be affirmed. Dkt. 24-11 ¶ 4. On March 9, 2020, Mr. Beasley rendered a written decision affirming the recommendation and upholding Plaintiff's termination from the County. *Id.* ¶¶ 5–6 & at 4.

Prior to the appeals hearing, Ms. Andresen had recommended to Lea Ann Thomas, the Deputy County Manager, that Mr. Lesniewicz serve as the interim Veteran Services Supervisor. Dkt. 39-14. In May 2020, after conducting interviews to fill the position permanently, Ms. Andresen recommended Lesniewicz for the job. Dkt. 39-15. He received the promotion. Dkt. 39-17. There is no evidence in the record that there was ever a notation or discussion about Lesniewicz's age before or after he was promoted.

By January 2021, Mr. Lesniewicz issued a written counseling to Mr. Clark due to several instances of allegedly unprofessional conduct. Dkt. 39-18. Clark

filed a written rebuttal.  Dkt. 39-19.  The written warnings continued, and Clark

voluntarily resigned on October 28, 2021.  Dkts. 39-20 & 39-21.  The documents

exchanged between Lesniewicz and Clark contain no mention of any

discrimination or retaliation.  *Id.*

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material

fact remaining for trial.  Fed. R. Civ. P. 56(a).  Materiality is defined by the

substantive law concerning the elements of the claim which might affect the

outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  A material fact is

genuine if the evidence "is such that a reasonable jury could return a verdict for the

nonmoving party."  *Anderson*, 477 U.S. at 248, 250 (stating summary judgment

standard mirrors directed verdict standard); *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986) (holding that where the record taken as a

whole could not lead a rational trier of fact to find for the nonmoving party, no

genuine issue exists for trial).  All ambiguities and inferences to be drawn from the

facts in the record must be viewed and resolved in the light most favorable to the

nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)

(citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Inferences based

on speculation are insufficient to withstand summary judgment. *Marshall v. City of Cape Coral, Fla.*, 797 F.2d 1555, 1559 (11th Cir. 1986).

## DISCUSSION

### Count I—Racial Discrimination

*Disparate Treatment*

Plaintiff Williams contends that he was terminated because of his race. In disparate treatment claims, Title VII makes is unlawful for an employer to discriminate "because of" an individual's race, which may be proven by showing that the protected trait was a "motivating factor" in the challenged employment decision. *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739–40 (2020). The traditional "but-for" causation standard does not require the protected characteristic be the sole cause for the adverse decision. *Id.* at 1739 ("Often, events have multiple but-for causes.").

To avoid summary judgment, Plaintiff must establish that a material issue of fact exists as to whether Defendant engaged in intentional discrimination. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018). Plaintiff must show by either direct or circumstantial evidence that his employer acted with discriminatory intent. *Id*. (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004)). "Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Wilson*, 376

F.3d at 1086 (internal quotation marks omitted and alterations included).  Direct

evidence includes "blatant remarks, whose intent could mean nothing other than to

discriminate" against a protected class.  *Id*. (citations omitted).

Neither Mr. Kirkhart's nor Mr. Lesniewicz's statements constitute direct

evidence of racial discrimination.  At Mr. Williams' deposition in April 2022, he

testified that Mr. Kirkhart told him that "the only reason why you're still working

here is because we allow you to."  Dkt. 24-2 at 18, 19.  Williams admitted that the

comment "could mean a lot of different things," such as age or race, but that he did

not know "what all he's [Kirkhart] motivated by."  *Id*. at 18.  There is no indication

that Williams ever reported to anyone that Kirkhart made this comment.  This

statement was not raised at the appeal hearing, nor did anyone ask Kirkhart at the

hearing if he made this statement.  In any event, one can reasonably infer that the

statement had nothing to do with either age or race.

Although there is no evidence that Mr. Lesniewicz made any questionable

comments to Plaintiff, Mr. Clark allegedly told Plaintiff about a conversation

between Lesniewicz, Kirkhart, and himself.  *Id.* at 19; Dkt. 24-21 at 17, 19.  At

Plaintiff's deposition, he testified that Clark said his two co-workers asked him to

complain to Ms. Andresen about Plaintiff because Clark is also African American

and his complaints would "stick."  Dkt. 24-2 at 14, 17, 19.  At the appeal hearing,

Cox testified that Clark told him that his two co-workers "manipulated me [Clark]

into going to [Ms. Andresen] to go against [Plaintiff]." Dkt. 24-21 at 9. Cox

elaborated no further on the substance of the conversation he had with Clark. *Id.* at

8–9. Also, at the appeal hearing, Mr. Clark denied that the conversation with his

two co-workers ever took place. *Id.* at 32, 38.

When Ms. Andresen questioned Mr. Lesniewicz at the hearing, he denied

this conversation ever happened, and Mr. Williams did not follow up with any

questions. *Id.* at 17–24. Even assuming the conversation took place, it is not direct

evidence of discriminatory intent because it requires an inference that the co-

workers wanted Plaintiff terminated based on his race.

Finally, no racial comments are attributed to Ms. Andresen. At Mr.

Williams' deposition, he testified that he never heard Andresen make any type of

racial statement or epithet toward him or anyone else. Dkt. 24-2 at 7–10, 16. He

confirmed that he never reported or invoked the County's procedure for reporting

race (or age-based) discrimination or harassment in the workplace. *Id*. at 8. He

never orally or in writing communicated to the human resources department that

"the issues with Ms. Andresen were motivated by [] age and/or [] race and that it

was discrimination and/or harassment." *Id*. He agreed that he never told the

appeals council that he believed Ms. Andresen's act in terminating him, or that his

termination in any way, was based on his race. *Id*. at 9–10. He also could not

point to any facts that showed either the appeals council's recommendation or the

County Manager's affirmance of his termination was based on race discrimination. *Id*. at 9–10, 16.

<u>*Prima Facie Case*</u>

In a case of circumstantial evidence, such as this one, the *McDonnell Douglas* burden-shifting test applies to prove Title VII discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S 792 (1973); *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002). To establish a *prima facie* case of Title VII discrimination, the plaintiff must show membership in a protected class, an adverse employment action, compliance with job qualifications, and the employer's more favorable treatment of "similarly situated" employees outside the protected class. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (*en banc*). The burden does not shift to the defendant to articulate a legitimate, nondiscriminatory reason until the plaintiff proves a *prima facie* case. *Id*. at 1221. Here, Plaintiff has established the first three elements.

As to the fourth element, several comparators are suggested. It is only by showing that an employer "has treated 'like' employees 'differently'— *i.e.*, through an assessment of comparators—that a plaintiff can supply the missing link and provide a valid basis for inferring unlawful *discrimination*." *Id*. at 1223 (emphasis in original). The term "similarly situated" means that the plaintiff and his comparators are "similarly situated in all material respects." *Id*. at 1224, 1229,

1231.  A comparator need not be the plaintiff's "doppelganger" but will have engaged in the same basic conduct, will have been subject to the same workplace policies, will typically have been under the purview of the same supervisor, and will share the plaintiff's employment or disciplinary history.  *Id*. at 1226–28.

In Plaintiff's initial response, he asserts that his subordinates Mr. Lesniewicz and Mr. Kirkhart are comparators.  Dkt. 25 at 12–13.  Mr. Williams contends they "engaged in egregious conduct" but were treated more favorably.  *Id.* at 13.  Mr. Williams believes he was fired for enforcing the chain of command workplace policy too strictly (even though the chain of command policy permits subordinates to go directly to a higher supervisor if their issues are not resolved), while his comparators were rewarded for breaking workplace protocol.  For what should be obvious reasons, his subordinates are not similarly situated to him in all material respects.  Not only do their job duties differ because they do not supervise, but Plaintiff was terminated for failure to properly fulfill his duties as a supervisor, not an officer.

Another comparator Plaintiff posits was treated differently is Greg Alpers, a Caucasian senior planner for Housing and Neighborhood Development.  Dkt. 15 ¶¶ 16, 17.  Mr. Williams alleges that Mr. Alpers was the subject of harassment complaints from two African American subordinates in 2014.  *Id.* ¶¶ 16, 17, 135–142; Dkt. 24-2 at 7.  The BOCC denied these allegations.  Dkt. 19.  Mr. Williams

testified at his deposition that Mr. Alpers, like him, reported to Ms. Andresen and was enforcing BOCC "workplace policies" concerning the two subordinates. Dkt. 24-2 at 7. Mr. Williams claims that rather than terminate Alpers, Ms. Andresen "backed [Alpers] up every time" and therefore Williams was treated differently. *Id*. Plaintiff also adds, without support in the record, that Alpers shared a lengthy history with Ms. Andresen because Alpers introduced her to her husband. Dkt. 15 ¶ 137. Even if true, this constitutes a *nondiscriminatory* reason for any lack of discipline.

Mr. Williams admitted that he had no direct involvement or knowledge of any of the incidents, complaints, or interactions involving Mr. Alpers with his subordinates or with Ms. Andresen. *Id*.; Dkt. 24-1 at 7–8. Alpers worked in a completely different division and held a different position. Dkt. 15 ¶ 16. Neither Alpers' job duties nor disciplinary history is found in this record.[3] Significantly, there is no description of what "workplace policies" Alpers was trying to enforce. No meaningful comparison can be made without the benefit of the conduct of the events and similarities between Plaintiff and a comparator leading up to adverse

---

[3] The record includes one written reprimand of Mr. Alpers in early 2015 for violating BOCC's chain of command policy. Dkt. 39-5. Mr. Alpers violated the policy by setting up an appointment with the deputy county manager of a different division without informing his supervisor, the deputy county manager over Housing and Neighborhood Development. *Id*. Mr. Williams' situation is the reverse—he claims that he was terminated for following and trying to enforce the chain of command policy.

action.  Plaintiff has not shown that he and Alpers were similarly situated in all material respects.

In his supplemental submissions, Plaintiff identifies another possible comparator: Ms. Shaneal Allen, a black woman who worked as a manager in the County's Social Services Division.  Dkt. 39-2.  Ms. Allen filed a written complaint with the BOCC based on events that occurred in 2011 and 2012.  *Id*.  Ms. Allen, who was one of nine managers, claimed that Ms. Andresen both discriminated against her by treating her differently from the other white managers within the Social Services Division, specifically in the form of pay disparity, and retaliated against her.  *Id.* at 1−2.  After an investigation in 2013, the race discrimination allegation was found to be unsubstantiated.  *Id*. at 6.  However, the retaliation claim was substantiated.  *Id*.  The retaliation involved Andresen's actions after Ms. Allen's formal complaint successfully resulted in a pay increase.  *Id.* at 3−4.  Ms. Allen reported Andresen's subsequent conduct of disrupting Allen's staff meetings, thereby undermining her authority, and halting her weekly supervision meetings with Allen.  *Id*.

Mr. Williams argues that his situation "is an almost exact replica of Ms. Allen's."  Dkt. 39 at 11.  The Court disagrees.  He claims that, just like Ms. Allen, he complained about Ms. Andresen giving certain Caucasian employees preferential treatment.  *Id*.; Dkt. 39-12.  In this vein, Williams relies on a complaint

he made to Mr. Velazquez with human resources.  Dkt. 39-12 (Velazquez's notes from the meeting dated 11/21/2019).  Williams told Velazquez that Ms. Andresen "promot[ed] the violation of the County's chain of command policy."  Dkt. 39 at 6.  Williams told him he wanted Ms. Andresen to give him "the trust and backing to support BOCC policies, instead of listening to the other Veteran Services Officers."  *Id.*; Dkt. 39-12.

However, unlike Ms. Allen's formal complaint, Mr. Williams' "complaint" to Mr. Velazquez had nothing to do with pay disparity, nor discrimination based on race (or age).  First, Ms. Allen's discrimination claims, some concerning failure to follow the chain of command, were found unsubstantiated.  Dkt. 39-2 at 4.  In fact, these 2013 findings reveal and confirm Ms. Andresen's position regarding the chain of command: "[E]mployees should first go to their immediate supervisor for resolution and if not met, continue to the next level until it is resolved[—]an open door policy."  *Id.*  Ms. Andresen's understanding mirrors the written chain of command policy: "[E]mployees are ordinarily expected to address issues and concerns with their immediate supervisors, first. Then, if important and relevant issues cannot be resolved at that level, you have the opportunity to move up to the next level[.]".  Dkt. 24-12 at 30 (BOCC Employee Handbook, § 1.2 Chain of Command).

24

Importantly, unlike Ms. Allen, Plaintiff never made, much less filed, a complaint alleging race or age discrimination. Plaintiff never told anyone at the County he had been discriminated against based on race or age.

Nevertheless, Plaintiff contends he should have been afforded the same detailed investigation as was Ms. Allen. Dkt. 39 at 11. He claims that Mr. Velazquez gave him no support but instead told him that "he did not have the authority to tell Ms. Andresen what to do, but he would ask the Director of Human Resources to talk to Ms. Andresen and convey the importance of the Plaintiff's position, as well as the need for the Plaintiff to advocate and promote BOCC policies without Ms. Andresen interfering." Dkt. 39 at 11–12. In keeping with protocol, Velazquez set up the pre-disciplinary conference with Andresen as Director of the Health and Human Services Division. Dkt. 24-10 ¶¶ 6, 7; Dkt. 24-20; Dkt. 24-3 ¶ 33. After the meeting, Andresen upheld the termination and Plaintiff appealed. Dkt. 24-20; Dkt. 24-3 ¶ 36. Unlike Ms. Allen, Plaintiff was afforded a hearing before a neutral four-member board. The Court finds that Mr. Williams was not similarly situated in all material respects to Ms. Allen.

In his supplemental response, Plaintiff attempts to again compare himself with Mr. Lesniewicz, but this time for actions taken after Plaintiff was terminated from the County. Dkt. 39 at 8, 12. Lesniewicz was promoted to Veteran Services Supervisor in 2020. Plaintiff argues that Lesniewicz in his role as supervisor

"began treating Mr. Clark adversely different than similarly situated Caucasian Veteran Service providers," which led to Clark's voluntary termination in October 2021, almost two years after Mr. Williams was terminated from the County.  *Id.* at 12; Dkt. 39-21.  Notably, Mr. Clark never made any complaints in any form about racial discrimination against Mr. Lesniewicz.

Even assuming this after-the-fact comparison is appropriate, the record does not show that Mr. Lesniewicz, as Mr. Clark's supervisor, exhibited conduct similar to that of Mr. Williams.  Several written personnel communications, including disciplinary actions, indicate that the issues with Mr. Clark were far different than any issues among Plaintiff and his staff.  *See* Dkts. 39-18, 39-19, 39-20.  Another dissimilarity was revealed through Mr. Clark's testimony at the appeal hearing. Mr. Clark gave a brief history of how his relationship with Mr. Lesniewicz started out poorly because Plaintiff claimed responsibility for hiring Mr. Clark and told Clark that Lesniewicz did not want him hired.  Dkt. 24-21 at 38.  Plaintiff has failed to show a comparator sufficient to meet the fourth element of a *prima facie* case.

## *Defendant's legitimate reasons*

Had Plaintiff established a *prima facie* case for Title VII disparate treatment under the *McDonnell Douglas* framework, the burden would shift to Defendant to articulate a legitimate, nondiscriminatory reason for terminating Mr. Williams.

The employer's burden to show its reasons were nondiscriminatory is "exceedingly light." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1984).

Defendant BOCC contends that it terminated Mr. Williams because he failed and refused to stop demeaning and belittling his staff, to heed and follow directives to build a cohesive team, and to acknowledge that he played any part in his staff's low morale to the point of seeking employment elsewhere. These proffered legitimate, nondiscriminatory reasons are supported by the following evidence.

It bears repeating that when Defendant hired Mr. Williams, he was a 40-year-old African American. Dkt. 24-2 at 4. At the time Mr. Williams was promoted by Ms. Andresen to the supervisor position in 2019, Ms. Andresen was aware he was over 40 and African American. Dkt. 24-3 ¶¶ 6, 10. Ms. Andresen acknowledged that Mr. Williams was the most qualified for the promotion.

Three months after Plaintiff's promotion, he was advised to engage in team building to lift the spirits of his subordinates. *Id.* at 11–12; Dkt. 24-15. Ms. Andresen confirmed that Mr. Williams' supervisees began complaining to her about his lack of supervisory skills shortly after his promotion. Dkt. 24-3 ¶ 16; Dkt. 24-21 at 44. None of the complaints were based on age or race. Dkt. 24-3 ¶ 17. Ms. Andresen held meetings with Mr. Williams twice a month, if not weekly. *Id.* ¶ 18 (weekly); Dkt. 24-21 at 6 (twice a month). In those meetings, she encouraged him to work on team building. Dkt. 24-3 ¶ 18.

27

Ms. Andresen continued to receive complaints from almost all of his supervisees—not just the three who testified at the appeal hearing.  *Id.* ¶ 22; Dkt. 24-21 at 44.  In his second evaluation in October 2019, Ms. Andresen informed Mr. Williams that his team was disgruntled and actively looking for other employment.  Dkt. 24-3 at 13.  She attributed the situation to Mr. Williams' leadership style.  *Id.*  Ms. Andresen specifically wrote that Plaintiff failed to maintain the status quo of the team—its cohesiveness and general comradery— when he took over in his supervisory position.  *Id.*; Dkt. 24-21 at 6–8.  Mr. Williams disagreed about the term "status quo" and thought the everyday operations of his team needed to change.  Dkt. 24-21 at 3.  He claimed that Ms. Andresen's failure to enforce the chain of command protocol by allowing his team to bypass him, violate comp time rules, and arrive late to work only undermined his ability to properly supervise.  *Id.*

Although Ms. Andresen commended Plaintiff in the second evaluation for participating actively in community outreach, she wrote: "The perception of your team is that you do not listen to them, you belittle them and do not respect them. Your approach is authoritative and controlling when it comes to leading your team. You have become alienated from them and when confronted you become

reactionary and/or defensive." *Id*.  She informed him that if he did not turn staff around, she would take more drastic measures.[4]

The staff complaints did not stop.  *Id*. ¶¶ 15–37; Dkt. 24-3 ¶ 25.  Mr. Williams did not heed Ms. Andresen's directives to eat lunch together weekly with his staff, hold one on one supervisory meetings with his staff, or speak to his staff with respect.  Dkt. 24-3 ¶¶ 25, 26; Dkt. 24-21 at 6–8.  In November 2019, his probationary term was extended another month.  Dkt. 24-3 ¶ 27 & at 14–15.  Ms. Andresen gave two specific examples of how Mr. Williams could improve his management style by communicating in person with his supervisees rather than by emails copied to unnecessary recipients.  *Id*. at 14.  She concluded:

> It is apparent that you continue to be alienated from your team. This stems from both you being unable to engage with them and their inability to trust you. It is expected as the leader of the team, that you display effective skills to communicate needs, deliver ideas, explain directives and create an atmosphere of cohesiveness among the Veteran Service Officers. . . . If immediate changes in all of the expected areas are not demonstrated, further action up to and including termination will be considered.

Dkt. 24-3 at 15.  The group's morale never ceased spiraling downward, which resulted in Mr. Williams' termination in December 2019.  Dkt. 24-21 at 44.

The three subordinates who testified at the appeal hearing corroborated Ms. Andresen's position.  Each stated that they had complained to Ms. Andresen about

---

[4] It is the BOCC's standard procedure to place an employee on six months' probation when he or she is promoted.  Dkt. 24-3 ¶ 15.

his supervisory style. Dkt. 24-21 at 15–24 (Lesniewicz), 24–29 (Kirkhart), 30–37 (Clark). Plaintiff was described as "toxic," and they each gave examples of how he belittled and demeaned them. *Id*. For example, he often took retaliatory measures against them in the form of giving them more work or taking more control of their time. To them, Mr. Williams was more concerned with other matters than making their schedules manageable and building cohesiveness among the group.

Mr. Clark testified about several specific instances when he felt Mr. Williams belittled and disrespected him. *Id.* at 30–33. He testified that he came to Ms. Andresen to discuss the following problems he faced with Mr. Williams: (1) Mr. Williams wanted no one to go to Ms. Andresen without talking to him first; (2) Mr. Williams threatened to write the subordinates up for being a few minutes late to a meeting when they were late due to client meetings; and (3) Mr. Williams wanted their office doors shut while in client meetings even though they left them open as a safety measure to protect themselves in case of difficult clients. *Id.* at 31–32. With respect to the conversation Clark had with Mr. Cox, Clark testified that he did not go to Cox to speak with him about trying to get rid of Plaintiff but instead about the issues between Clark and Plaintiff. *Id.* at 37–39.

Given the proffer of legitimate, nondiscriminatory reasons for termination, the burden then shifts under *McDonnell Douglas* back to the plaintiff to produce

evidence that the reasons were pretextual—*i.e.*, that the reasons for the adverse employment action were false *and* that the real reasons for the action were motivated by discrimination. *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*)). To establish pretext, the plaintiff must meet the employer's reason "head on and rebut it." *Id.* (citing *Chapman*, 229 F.3d at 1024); *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265–66 (11th Cir. 2010). He must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez*, 610 F.3d at 1265 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)); *McPhie v. Yeager*, 819 F. App'x 696, 698 (11th Cir. 2020) (quoting same). The Court addresses Plaintiff's assertions of pretext below.

*"Convincing Mosaic"*

Although a *prima facie* case of disparate treatment under *McDonnell Douglas* may fall short, often when a proper comparator does not exist, a "plaintiff will always survive summary judgment if he presents . . . 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir.

2019) ("*Lewis II*").[5]  "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (citations omitted).[6]  Although Plaintiff does not specifically address each of these three items, he argues that he has shown discrimination from various incidents that, when compiled, form a mosaic sufficient to create a disputed issue of material fact concerning intentional discrimination.  Dkt. 39 at 9–13.

First, Plaintiff relies on Ms. Allen's case to argue that Andresen treated employees outside his protected class more favorably.  *Id.* at 10−12.  While it is true that Andresen was found to have retaliated against Allen years before Plaintiff was hired, the claims of discrimination based on disparate pay were found unsubstantiated after an investigation.  For retaliation, Andresen received a written reprimand, was closely monitored for six months, and was required to take leadership management and diversity training courses.  Dkt. 39-3.[7]

---

[5] The Seventh Circuit, where the phrase "convincing mosaic" originated, has emphasized that the term is not a legal test, standard, or requirement.  *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–766 (7th Cir. 2016).

[6] *See also Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008).

[7] Plaintiff points out that Ms. Andresen was also placed on a two-week unpaid suspension in 2016 for failing to timely submit a top priority grant application.  Dkt. 39-6.  However, the

Contrary to Mr. Williams' position, Ms. Allen's situation was different in material respects.  Ms. Allen filed a detailed written complaint articulating racial discrimination in the form of disparate pay and retaliation for reporting Andresen to her superiors.  Andresen shared a lengthy, very positive relationship with Ms. Allen.  The incident involving Ms. Allen occurred at least seven years prior to Plaintiff's termination, and Ms. Andresen successfully adhered to and completed the assigned tasks and goals.

Tellingly, Plaintiff does not contend that he verbally complained to Mr. Velazquez at the November 2019 meeting, or to anyone at any point, about either discrimination or retaliation.  Velazquez's contemporaneous notes substantiate the fact that Plaintiff's complaint involved only Ms. Andresen's encouraging or promoting of his staff to violate the chain of command policy by skirting Plaintiff. Plaintiff does not contend he voiced these complaints to anyone else, and he admitted that he did not complain to anyone about racial or age discrimination or retaliation.  Lastly, Plaintiff's case was presented to the appeals council, which was made up  by a diverse group of individuals unfamiliar with the facts, and the council recommended to the final decision maker that Plaintiff's termination be affirmed.

---

infraction leading to the suspension had nothing to do with retaliation or discrimination.  This institutional action suggests only that Ms. Andresen was not immune from discipline.

Plaintiff also contends that Mr. Alpers' written reprimand in 2015 for failing to follow the chain of command is yet another incident that reflects negatively on Andresen's failure to enforce the chain of command policy as to Plaintiff's subordinates.  Dkt. 39 at 11.  Plaintiff insinuates that he was singled out and was not protected by workplace policies, although he strove to enforce them with his staff.  *Id.*  However, it was a different supervisor, not Ms. Andresen, who issued the reprimand to Mr. Alpers.  Dkt. 39-5.  Although Plaintiff urges this example to be considered evidence of how important the chain of command policy was to Defendant, Alpers' infraction did not fit within the open door exception to the chain of command policy; Mr. Alpers was reprimanded because he did not first discuss with his supervisor his intention to meet with another county manager about fund raising.  Plaintiff has not shown systematically better treatment of similarly situated employees.

In piecing together a convincing mosaic, the third consideration is pretext. "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside of the decision maker's head."  *Alvarez*, 610 F.3d at 1266.  The plaintiff cannot simply contradict the employer's reason but must show the real reason for termination was discrimination.  *See Gibson v. JetBlue Airways Corp.*, No. 20-10943, 2021 WL

5368056, at *7 (11th Cir. Nov. 18, 2021) (citing *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1339 (11th Cir. 2015)).

Undoubtedly, Mr. Williams takes issue with the wisdom of Defendant's reasons.  He relies on his own assessment that he was a good employee who followed workplace policies.  However, the evidence shows that Ms. Andresen also followed workplace policies.  She stated that she employed an open door policy.  Dkt. 24-21 at 6.  As discussed above, an open door policy is part of the chain of command policy—the precise policy Mr. Williams claims Defendant ignored in his instance.  The BOCC policy provides that "employees are asked to address issues with their immediate supervisor first and then progress to the next level if not satisfied" or if issues cannot be resolved.  Dkt. 39-5; Dkt. 24-12 at 30 (BOCC Employee Handbook, § 1.2 Chain of Command).[8]  The open door policy allowed Mr. Williams' team members to talk to Ms. Andresen (the "next level") if they first went to Mr. Williams but were not listened to or their problems were not resolved.  Dkt. 24-21 at 6.  Ms. Andresen and three of Mr. Williams' subordinates testified that Mr. Williams did not listen to or resolve the subordinates' problems when they were first addressed with him.   The appeals council did not find that Ms. Andresen or the three team members' testimony lacked veracity or credence.

---

[8] This policy was recognized as far back as 2013 by the Equal Opportunity Administrator Ms. Buford.  Dkt. 39-2 at 4.

35

Plaintiff attempts to highlight other evidence or theories to support pretext, such as the alleged pressure placed on Mr. Clark to complain to Ms. Andresen.  At Mr. Williams' deposition, he testified that Mr. Clark told him that Mr. Kirkhart and Mr. Lesniewicz "needed one African American to [complain] in order for it to stick."  Dkt. 24-2 at 19.  He claims Mr. Clark told him that these two co-workers told Mr. Clark, "We just need you to go make this complaint," and that Mr. Clark "just didn't feel right about it . . . two Caucasian guys are using an African American guy to take down another African American guy."  *Id*.  At the appeal hearing, Mr. Clark denied that he had this conversation with Mr. Williams, and Mr. Lesniewicz denied ever making such a demand of Mr. Clark.  Mr. Clark also denied that he told Mr. Cox that Mr. Lesniewicz and a co-worker "manipulated me into going to [Ms. Andresen] to go against [Mr. Williams]."  Dkt. 24-21 at 9, 37–39.

Even assuming Williams' version of events is correct, there is no evidence that Andresen, or any other person at the County, was aware of any plot to oust Plaintiff, nor is there anything to indicate Lesniewicz or Kirkhart's manipulation was based on a discriminatory animus.  It might be inferred that the exchange indicates the co-workers' dislike for Mr. Williams as a supervisor and the belief that a complaint from Clark would carry more weight as a member of the protected class.  That the co-workers thought the race of a co-worker might be helpful in

36

reaching their ultimate goal does not lead to the conclusion that the co-workers harbored racial animosity toward their boss.  This also does not establish that Andresen, as the initial decision maker, held racial animus toward Plaintiff.

Not to overlook any piece of potential evidence, the Court recognizes that Plaintiff in his response states that "Kirkhart, speaking on behalf of himself and Mr. Lesniewicz, stated the only reason why you are in charge and working here is because we allow you to.'"  Dkt. 25 at 16.  This comment was not addressed at all at the appeal hearing.  Even if true, this comment is insufficient to demonstrate racial animus.

Plaintiff has failed to show that Defendant's nondiscriminatory reason was false.  Plaintiff cannot rely solely on his own assessment that he was correctly doing his job by enforcing BOCC policies and could not justifiably be terminated for doing so.  The disciplinary actions leading up to and resulting in termination are well-documented by Defendant.

Nor has Plaintiff provided evidence sufficient to create a disputed issue of fact that unlawful discrimination was the true reason for his termination.  Based on this record, Defendant was genuinely dissatisfied with Plaintiff for treating his team disrespectfully and for failing to heed suggestions to alter the situation, as opposed to using the co-workers' complaints to cover up racial discrimination.  There is no triable issue concerning the employer's supposed discriminatory intent.

*Liability*

Perhaps the most glaring flaw in Plaintiff's case is the inability to attribute racial animus to a decision maker and therefore establish liability on the part of Defendant. To this end, Plaintiff invokes a "cat's paw" theory. Dkt. 25 at 13–14. The typical fact pattern of a cat's paw case presents the plaintiff's supervisor as the manipulator. The supervisor, who has the discriminatory animus, then convinces the ultimate decision maker (the cat's paw) to impose an adverse action on the plaintiff. *See*, *e.g.*, *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328 (11th Cir. 1999).[9]

Subordinates

Initially, Plaintiff identifies Ms. Andresen as the cat's paw, or agent, of the alleged discriminators Lesniewicz and Kirkhart. *Id.* at 14. Plaintiff contends that Andresen was the ultimate decision maker who "relied exclusively" on Plaintiff's subordinates' complaints that Plaintiff's ability to get along with others was "unsatisfactory." *Id.* According to Plaintiff, Andresen merely rubber-stamped the discriminatory wishes of Plaintiff's subordinates, which were designed and intended to cause Plaintiff's termination. *Id.* Thus, argues Plaintiff, even though

---

[9] *See also Sims v. MVM, Inc.*, 704 F.3d 1327 (11th Cir. 2013). In *Sims*, an age discrimination case, the employee argued that Mr. Davis, his immediate supervisor, was biased and that Mr. Perkins, the project manager and the decision maker, acted as a "mere cat's paw" for Mr. Davis' discriminatory animus. *Id.* at 1334–35.

Ms. Andresen bore no discriminatory animus, she was influenced by Plaintiff's supervisees' recommendations that were the product of their own discriminatory animus, and she failed to independently investigate the facts. *Id.* Plaintiff claims that Lesniewicz and Kirkhart held racial animus as evidenced by their allegedly asking Clark to complain to Ms. Andresen because they supposedly needed an African American employee to join in their attempt to orchestrate Williams' termination.

These facts fall short for two reasons. First, low level non-supervisory employees cannot be considered manipulators capable of imposing liability on the employer. Second, the employer here independently investigated the circumstances supporting the supervisor's recommendation to terminate.

Here, Plaintiff seeks to make his subordinates the manipulators. The cases cited by the parties and those found through independent research reveal that the discriminatory animus must lie in an individual who supervises the plaintiff—not in a co-worker or in someone supervised *by* the plaintiff. There is no Eleventh Circuit authority extending employer liability based on the conduct of co-workers, much less subordinates.[10]

---

[10] Another circuit has extended employer liability based on co-workers' retaliatory discriminatory animus. *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 273–75 (2d Cir. 2016).

The plaintiff must also show that the decision maker followed "the biased recommendation without independently investigating the complaint against the employee." *Stimpson*, 186 F.3d at 1332.  Even if the cat's paw theory covered this factual scenario, Plaintiff fails to show Ms. Andresen as his supervisor did not independently investigate the subordinates' complaints.  All three supervisees were ready to quit their jobs based on Plaintiff's managerial style.

Ms. Andresen met with Plaintiff weekly or biweekly and provided three or four written evaluations over the course of six months documenting his supervisory style and lack of team building skills to his grave detriment.  In the meetings, Mr. Williams explained to Andresen that his top priority was enforcing BOCC workplace policies, which included rigid hours and encouraging more one-on-one client sessions which carried extensive paperwork requirements.  Ms. Andresen responded that his subordinates could manage their own time and that Mr. Williams should focus on team building with weekly lunches, verbal encouragement, and a more flexible schedule.  The BOCC's open-door policy permitted her to speak with the three subordinates, which she did, and to directly ascertain that they were extremely unhappy with Mr. Williams' management style. Even if Andresen's investigation had fallen short, the appeals council heard the facts, asked questions, and recommended termination to the County Manager.

Supervisor

As an alternate theory, Plaintiff argues that Ms. Andresen held racial animus and manipulated the appeals council to accept her recommendation to pass along to the ultimate decision maker and County Manager, Mr. Beasley.  Even assuming there was evidence of Ms. Andresen's racial animus, and there is none,[11] the appeals council held a hearing at which Plaintiff presented his case, three subordinates testified, and an employee, Mr. Cox, testified on Plaintiff's behalf. As in *Stimpson*,[12] any causal link between Ms. Andresen's alleged animus and Mr. Williams' termination was disrupted by the appeals council's hearing and the independent decision of the County Manager to terminate Mr. Williams. Conducting a hearing suffices as an independent assessment of the facts by the appeals council absent any evidence of coercion.

Plaintiff has not shown that Ms. Andresen harbored discriminatory animus based on Mr. Williams' protected characteristic of race or that he was terminated based solely on Ms. Andresen's recommendation.  Ms. Andresen held steadfast

---

[11] To the extent the 2011 incident with Ms. Allen may be considered, Ms. Andresen was not found to have discriminated against Ms. Allen, and the Court finds that there is no evidence that Andresen based her decision here on race.  *See Robertson v. Riverstone Comtys., LLC*, 849 F. App'x 795, 807–08 (11th Cir. 2021) (rejecting application of cat's paw theory and affirming that no evidence suggested that a decision maker was aware of past alleged racial animus of supervisor).

[12] In *Stimpson*, the employee's jury verdict was overturned because there was no evidence that the ultimate decision maker (the Civil Service Board) followed the allegedly biased recommendation of the recommender (the City) without first independently investigating the complaint against the employee.  186 F.3d at 1332.  The Board did not act as a rubber stamp (or cat's paw) for the City because the Board reached an independent decision after conducting a lengthy hearing to investigate the charges.  *Id.*

that Mr. Williams should lighten up on his enforcement of workplace policy, which should be applied equally to his African American and Caucasian subordinates.  Plaintiff has not shown a triable issue on his claim of disparate treatment.

## <u>Count II—Age Discrimination</u>

### <u>*Prima Facie Case*</u>

Like Title VII discrimination cases based on circumstantial evidence, the burden-shifting *McDonnell Douglas* framework applies to age discrimination. *Liebman v. Metro. Life Ins.*, 808 F.3d 1294, 1298 (11th Cir. 2015) (citing *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013)).  A *prima face* case of age discrimination under the ADEA requires a plaintiff to show: (1) the plaintiff's membership in the protected group of persons "at least forty years of age"; (2) adverse employment action; (3) a "substantially younger" person filled the position from which the plaintiff was discharged; and (4) the plaintiff was qualified for the job at the time of termination.  *Id.* (citing *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012)).

Mr. Williams was in his early 40s when he was terminated from his position with the BOCC.  Mr. Lesniewicz filled the position of Veteran Services Supervisor after Williams was terminated.  Lesniewicz is at least ten years younger than Mr. Williams and therefore considered substantially younger.  *See Liebman*, 808 F.3d

at 1299 (holding seven years is substantially younger and noting as few as three years may suffice). Plaintiff has met the first three factors of an age discrimination claim.

At the *prima facie* stage, a plaintiff's skills and background determine the fourth element—whether the plaintiff was qualified for the job. *Reed v. Forney Indus., Inc.*, 800 F. App'x 782, 786 (11th Cir. 2020). No one disputes that Mr. Williams was qualified, in fact the most qualified, for the job at the time he was promoted. At the time of his termination, Plaintiff had worked for Defendant for about three years. The length of employment may be considered in determining qualifications, but Mr. Williams' three-year overall tenure is not particularly lengthy. Additionally, he had received well-documented poor performance evaluations within the six-month probationary period after his promotion. Nevertheless, his documented poor performance may not be used to establish he was no longer qualified for the job. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (collecting cases). Issues of poor performance become relevant later in the analysis in determining whether the employer's proffered nondiscriminatory reasons for termination were pretextual. *Reed*, 800 F. App'x at 786 (citing *Damon*, 196 F.3d at 1360). For purposes of summary judgment, Mr. Williams has established a *prima facie* case of age discrimination.

<u>Legitimate Reasons and Pretext</u>

Defendant's reasons for termination, as discussed above, were Plaintiff's inability to properly supervise, successfully implement Ms. Andresen's team-building strategies and techniques, and change his mindset about the need for a rigid enforcement of certain workplace policies.  Defendant here met its burden of production with the well-documented periodic evaluations and the testimony of the three supervisees confirming the Plaintiff's poor supervisory skills.

Because Defendant articulated legitimate, nondiscriminatory reasons for its action, the burden shifts back to the Plaintiff to show pretext—that Defendant's reasons are false, and the real reason is discrimination.  *Thompson v. Dekalb Cnty., Ga.*, No. 19-11260, 2021 WL 5356283, at *7 (11th Cir. Nov. 17, 2021) (first citing *Springer v. Convergys Customer Mgmt. Grp., Inc*., 509 F.3d 1344, 1349 (11th Cir. 2007); and then *Sims*, 704 F.3d at 1332) (affirming summary judgment for employer in age discrimination for lack of pretext and citing).  Defendant, including Ms. Andresen, was aware of Mr. Williams' age when he was hired in 2016 and when he was promoted at age 42 in March 2019.  His age, at least initially, did not stymie his promotion.  Most notably, age was never raised at the appeal hearing.

Plaintiff testified as his deposition that Ms. Andresen "would often say to me" that she "wanted younger blood . . . in the ranks per se . . . younger folks, younger people."  Dkt. 24-2 at 6.  Mr. Williams explained further:

[S]he wanted [for] veterans services as a whole . . . we have a clientele of—of a lot older people, and she kind of felt that, I guess, we needed to attract younger folks or attract a younger crowd or try to reach out to a younger crowd, so she was all—she was all about trying to get a younger stance, you know, just younger people in general.

*Id.*  These past comments, assuming that they are attributable to Ms. Andresen, do not constitute direct evidence of age bias because they require an inference to be made that the desire to hire young people motivated the decision to terminate.  *See Ceranek v. United Airlines, Inc.*, No. 8:20-cv-2292-CEH-SPF, 2022 WL 4305614, at *13 (M.D. Fla. Sept. 19, 2022) (citing *Damon*, 196 F.3d at 1358–59) (giving examples).  These comments were not made near the time of his termination, nor were they made in connection with Mr. Williams' or anyone else's firing.  These comments will therefore be considered circumstantial.

In age discrimination cases, the plaintiff must show by a preponderance of the evidence, either direct or circumstantial, "that age was the 'but-for' cause of the challenged adverse employer action."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176–78, 180 (2009); *Liebman*, 808 F.3d at 1298  (citing *Gross*). [13]  Age discrimination cases decided after the Title VII case *Bostock* cite the standard enunciated in *Gross*: age must be *the*—not *a*—"but-for" cause.  *See, e.g.*, *Deneve v. DSLD Homes Gulf Coast, LLC*, 857 F. App'x 518, 521 (11th Cir. 2021) (citing

---

[13] *See also Godwin v. WellStar Health Sys., Inc.*, 615 F. App'x 518, 527 (11th Cir. 2015) (citing *Gross*, 557 U.S. at 177 and *Sims*, 704 F.3d at 1335).

*Gross* and *Sims*) (affirming summary judgment for employer in ADEA case);

*Robinson v. Walmart Stores East, LP*, No. 21-10560, 2021 WL 5881756, at *3

(11th Cir. Dec. 13, 2021) (citing *Gross*) (affirming the employee's failure to satisfy

pretext by referring to age as "the 'but-for' cause"). [14]

Applying "but-for" causation, the Court finds that Plaintiff's circumstantial

evidence is insufficient to create a genuine issue that age was the sole reason, or

even one of the reasons, for his termination.  Ms. Andresen was never questioned

about whether she remarked in the past about trying to reach younger people to

hire.  Even assuming she did make these statements, Plaintiff has not shown that

age discrimination was the true reason for his termination, nor even a material

factor in the entire decision-making process.

Mr. Williams admitted that he never complained to anyone at human

resources or risk management (or anyone, anywhere) that he felt he was being

---

[14] *But see Thomas v. Esterle*, No. 21-10638, 2022 WL 2441562, at *1 (July 5, 2022)
(unpublished) (*per curiam*) (changing modifier from "the" to "a" preceding "but-for" cause "to
comply with *Bostock*").  District courts within this district rely on *Gross* and have not compared
the "but-for" language of *Bostock* with *Gross*.  *See*, *e.g.*, *Ceranek*, 2022 WL 4305614, at *12;
*Bonomo v. Ezpawn Fla., Inc.*, No. 8:21-cv-1804-VMC-SPF, 2022 WL 9965278, at *12 (M.D.
Fla. Oct. 17, 2022).  However, other district courts in the Eleventh Circuit have addressed the
effect of *Bostock* on *Gross*.  *See*, *e.g.*, *Keller v. Hyundai Motor Manufacturing*, 513 F. Supp. 3d
1324, 1330–31 (M.D. Ala. 2021) (denying summary judgment in ADEA case after discussion of
*Bostock* and *Gross*).  This precise issue was presented to the Sixth Circuit in *Pelcha v. MW
Bancorp., Inc.*, 988 F.3d 318 (6th Cir. 2021).  In deciding an ADEA case regarding a similar
issue of the employer commenting on the age of other employees, *Pelcha* held that "the rule in
*Bostock* extends no further than Title VII and does not stretch to the ADEA."  *Id.*, 988 F.3d at
324.  Even if the *Bostock* logic obtained here, Plaintiff's case fails entirely on this record.

discriminated against because of his age.  Dkt. 24-2 at 7.  Ms. Andresen and Mr.

Velazquez confirmed that Plaintiff never complained about age discrimination.

Nothing in Mr. Velazquez's notes show that age was ever discussed.

Even under a cat's paw theory, Plaintiff has failed to show that Ms.

Andresen's recommendation was the "determinative cause or influence" on the

employer's adverse action.  *Godwin v. WellStar Health Sys., Inc.*, 615 F. App'x

518, 526, 528 (11th Cir. 2015) (citing *Sims*, 704 F.3d at 1335–36).[15]  Courts

caution against applying the cat's paw theory in an ADEA case based on the higher

statutory standard.  *Sims*, 704 F.3d at 1336; *Duncan v. Alabama*, 734 F. App'x 637,

640 (11th Cir. 2018) (stating theory is "inappropriate" for ADEA cases).

Nevertheless, the cat's paw was considered in *Godwin*.

In *Godwin*, the appellate court reversed summary judgment because there

was evidence that the biased direct supervisor made statements that could lead a

jury to find she wanted Ms. Godwin fired because of her age and that the

supervisor's recommendations were a determinative, sole influence on the higher

supervisor's decision to fire Ms. Godwin.  615 F. App'x at 529–31.  In *Godwin*,

the decision maker did not conduct an independent investigation.

---

[15] Showing age is a "motivating factor" is not enough.  *Godwin*, 615 F. App'x at 526 (citing *Sims*, 704 F.3d at 1336).  But as noted in the preceding footnote, age was not a material factor on this record.

Even assuming Ms. Andresen held age-based discriminatory animus, her motivation did not serve to manipulate the County Manager as final decision maker.  Unlike *Godwin*, the appeal hearing served as an independent investigation of the facts, and Mr. Williams was invited to present his entire case.  At the hearing, Mr. Williams made no mention of age, nor did anyone else.  Dkt. 24-21.  The appeals council, which made the final recommendation to the County Manager, never heard any argument or evidence that Ms. Andresen harbored discriminatory age animus.  Plaintiff has not provided sufficient evidence to create a jury question that Defendant's proffered grounds for termination were false and that age discrimination was the real reason for his termination.

### Count III—Retaliation

*Prima Facie Case*

Title VII prohibits an employer from retaliating against an employee based on the employee's 1) opposition to unlawful employment practice or 2) participation in an investigation of alleged discrimination.  42 U.S.C. § 2000e-3(a).[16]  The *McDonnell Douglas* test applies to retaliation cases in the absence of direct evidence.  *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir.

---

[16] In "private-sector" cases such as this, Title VII forbids discrimination "*because* [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or *because* [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Tonkyro v. Sec'y, Dep't of V.A.*, 995 F.3d 828, 833–34 (11th Cir. 2021) (emphasis in original) (quoting § 2000e-3(a)).

2020); *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). A *prima facie* case of retaliation requires proof by a preponderance of evidence that: (1) the plaintiff engaged in a statutorily protected activity; (2) the plaintiff suffered an adverse action; and (3) a causal link exists between the two. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (*en banc*) (Title VII retaliation); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (ADEA).[17]  The first and third elements are in dispute.

*Protected Activity*

Plaintiff identifies the sole protected activity in which he engaged as a note he submitted to the Human Resources Division at the County. Dkt. 15 ¶ 174. The amended complaint describes the writing as a request for "an investigation of the Plaintiff's immediate supervisor [Ms. Andresen] as to why the Plaintiff was disciplined because he held the Caucasian and African American employees under his charge to the same attendance and work performance standard." *Id*. Plaintiff consistently labels this protected activity as his opposition to Ms. Andresen's "racism" based on her refusal to enforce attendance and other workplace rules against Caucasian employees. *Id*. ¶¶ 175–78.

---

[17] It should be noted that the burden to show causation under the cat's paw theory in ADEA cases was not changed by *Staub*. *See Sims*, 704 F.3d at 1336.

Only once does Plaintiff mention participatory conduct and, in that instance, he describes the written request as "his participation in reporting the racist policy or practices to Human Resources." *Id*. ¶¶ 174–78. This conclusory reference does not turn his oppositional activity into participatory activity. Protected activity under the participation clause means that the plaintiff participated to some degree in filing a formal complaint or charge with the EEOC or in the investigation of proceedings brought under Title VII. *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 n.2 (11th Cir. 2000). The participation clause does not protect proceedings and activities which occur before the commencement of statutory proceedings. *Id.* at 1174. For example, "an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC" does not fall under the participation clause but is considered under the opposition clause. *Id.* Because Plaintiff never filed a complaint with the EEOC, any protection derives from the opposition clause.

The record does not contain a copy of the written request that Plaintiff pinpoints as the protected activity. In its absence, the allegations of the amended complaint may be considered as evidence on summary judgment because Mr. Williams signed the pleading under penalty of perjury. Dkt. 15 at 33 (verification of Mr. Williams); *see* 28 U.S.C. § 1746 (unsworn declarations under penalty of perjury); *Smith v. Jefferson Ctny. Sheriff*, No. 2:13-cv-852-SLB-JEO, 2015 WL

50

5050241, at *1 (N.D. Ala. Aug. 25, 2015) (considering an unsworn complaint signed under penalty of perjury as summary judgment evidence).  Other evidence in this record includes the transcripts of (1) the hearing before the council in March 2020 where Mr. Williams presented his case and (2) Mr. Williams' deposition taken in April 2022.  Plaintiff does not identify the recipient of the correspondence, nor does he provide the time frame within which he made the request to have Ms. Andresen investigated.  Mr. Williams never told Ms. Andresen that he made the request.

Though the Court views this evidence in the light most favorable to Plaintiff—that the missing written request voiced his opposition of Ms. Andresen's uneven enforcement of workplace rules based on an employee's race—Plaintiff still must show his subjective good faith belief is also objectively reasonable.  *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311–12 (11th Cir. 2002) (holding that statutorily protected expression must be supported by objectively reasonable belief in the record).  While Plaintiff may have subjectively believed Ms. Andresen was engaged in employment discrimination, the facts in the record bely any reasonable objectivity that Mr. Williams opposed any discriminatory practices based on age or race, and consequently there is no evidence that Ms. Andresen retaliated against him.  At his deposition, Mr. Williams admitted he never told anyone at the County, including Ms. Andresen, that he was treated differently

51

based on a discriminatory reason.  Dkt. 24-2 at 16 ("I believe I conveyed to HR that I was being treated differently, but I didn't specify age or race.").[18]  Plaintiff has failed to show a genuine issue of material fact regarding whether he engaged in a protected activity.

*Causation*

Assuming Plaintiff had shown he engaged in protected activity, the causal link between the protected activity and the adverse action must be established.  The plaintiff must show that the employer, or decision maker, was "actually aware" of the protected expression at the time of the adverse action.  *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920 (11th Cir. 1993).  Courts should interpret the causal connection element of retaliation broadly.  *Graves v. Avis Budget Grp., Inc.*, No. 8:20-cv-270-CEH-JSS, 2022 WL 3357580, at *8 (M.D. Fla. Aug. 15, 2022) (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008)).  A plaintiff need show only that the expression and adverse action are not completely or wholly unrelated.  *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d

---

[18] It should be remembered that Mr. Valezquez's notes and all witnesses throughout the appeal confirmed that Mr. Williams objected only to Ms. Andresen's enforcement of the chain of command policy without reference to race at all and certainly without a suggestion of any race-based discrimination.

1261, 1271 (11th Cir. 2017) (FMLA retaliation); *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (Title VII retaliation).

There is also a temporal proximity element involved; the closer in time the employer's action to the protected activity, the more likely a causal connection exists or at least creates an issue of material fact. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (Title VII retaliation); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (FMLA retaliation). The temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Where the decision maker "contemplates an adverse employment action before an employer engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (FLMA and ADEA retaliation).

To prove Title VII retaliation in this non-federal sector case, Plaintiff must show "the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S, 338, 352 (2013). The evidence fails to show, or create a genuine material fact, that Plaintiff would not have been terminated but-for his alleged seeking to instigate an internal investigation of Ms. Andresen. Ms. Andresen was not aware he had made such a request. She stated Plaintiff never once discussed with her that he thought he was

being treated differently based on race or age, Dkt. 24-3 ¶ 44, nor does Plaintiff contend otherwise.

Plaintiff's own deposition testimony substantiates Ms. Andresen's statements.  Plaintiff admits he never told human resources or Ms. Andresen that he was being treated differently because of his race or age.  Dkt. 24-2 at 16.  In addition to Plaintiff's own testimony, the existence of this written request (absent from this record) was not raised by anyone at the hearing before the appeals council.  Dkt. 24-21.  Mr. Velazquez, as the Employee Relations Manager of the Equity and Human Resources Division, stated that "at no point did [Mr. Williams] make any complaint to [him] of any race- or age-based discrimination or harassment."  Dkt. 24-10 ¶ 8.  Based on this record, Plaintiff has failed to present a *prima facie* case of retaliation.

## *Legitimate Nondiscriminatory Reasons and Pretext*

Had Plaintiff established a *prima facie* case of retaliation, a presumption of retaliation would have been created.  *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 n.6 (11th Cir. 2000).  The burden then shifts to the employer to rebut the presumption by articulating legitimate, nondiscriminatory reasons for the adverse action.  *Id.*  The presumption disappears once the employer offers such reasons.  *Id.*  The burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's stated reasons were a "pretext

for prohibited, retaliatory conduct." *Id.*; *Pennington*, 261 F.3d at 1266.  On summary judgment, the burden is more aptly described as submitting enough evidence that could allow a reasonable jury to find the reasons were pretextual and the adverse action was taken in retaliation for engaging in the protected activity. *Raney*, 120 F.3d at 1196–97 (citation omitted).

Plaintiff has failed to produce sufficient evidence of a genuine issue of material fact that his termination was pretext for retaliation.  Ms. Andresen wrote in her last evaluation dated November 7, 2019, that if Plaintiff did not make enumerated corrections, she would consider termination.  The missing note in which Plaintiff allegedly asks for her investigation is further missing a date and recipient.  Even assuming Mr. Williams' meeting with Mr. Velazquez on November 21, 2019, is construed as the protected activity, Ms. Andresen cannot be said to have acted in retaliation by following through with conduct she openly contemplated before the alleged protected activity occurred.

*Liability*

Plaintiff again relies on the cat's paw theory for his retaliation claim.  Dkt. 25 at 19.  Even if Plaintiff had sufficiently articulated retaliation, the cat's paw theory for ADEA retaliation cases must adhere to the "but-for" causation standard. *Godwin*, 615 F. App'x at 526, 528 (citing *Sims*, 704 F.3d at 1335–36); *see also Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015)

(noting that *Sims* held *Staub*'s "proximate causation standard inapplicable to cat's paw cases involving ADEA retaliation").  In any event, had Ms. Andresen terminated Mr. Williams for complaining to Mr. Velazquez, her retaliatory animus cannot then be extended to the County Manager's ultimate decision after a hearing on the merits.

Accordingly, Plaintiff has failed to meet his ultimate burden of showing a genuine issue of material fact exists as to whether Ms. Andresen or the appeals council were motivated to act in a retaliatory manner or that the Defendant's reasons for termination were a pretext for retaliation.  *See Sanz v. Wells Fargo Bank, N.A.*, No. 21-13868, 2022 WL 4397718, at *3 (11th Cir. Sept. 23, 2022) (affirming summary judgment for employer on discrimination and retaliation claims).  Summary judgment is granted as to Count III.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 24) is granted.  The Clerk is directed to enter judgment in favor of Defendant Polk County Board of County Commissioners and against Plaintiff, terminate all pending deadlines, and close the case.

**DONE AND ORDERED** at Tampa, Florida on November 18, 2022.

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

56

**<u>COPIES FURNISHED TO</u>**:
Counsel of record